# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-01406-SCT

*EDWARD S. BALLARD*

*v.*

*COMMERCIAL BANK OF DEKALB*

DATE OF JUDGMENT:                    07/05/2007
TRIAL JUDGE:                         HON. KENNETH M. BURNS
COURT FROM WHICH APPEALED:           CHICKASAW COUNTY CHANCERY
                                     COURT
ATTORNEY FOR APPELLANT:              WES W. PETERS
ATTORNEY FOR APPELLEE:               KEITH R. RAULSTON
NATURE OF THE CASE:                  CIVIL - REAL PROPERTY
DISPOSITION:                         AFFIRMED - 10/09/2008
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Commercial Bank of DeKalb sought to foreclose on Edward Ballard's property in Chickasaw County, Mississippi, pursuant to two deeds of trust which Ballard had executed in its favor. Thereafter, Ballard filed suit against Commercial Bank, seeking cancellation of the two deeds of trust. On July 5, 2007, the chancellor entered his final judgment, authorizing Commercial Bank to proceed with foreclosure on Ballard's property based upon either or both of Ballard's deeds of trust. Because we find that the chancellor's findings were neither manifestly wrong nor clearly erroneous and were supported by substantial evidence, we affirm.

**FACTS AND PROCEEDINGS**

¶2.     Ballard's first involvement with Commercial Bank ("the Bank") was in the spring of 2001, when he and his grandson, Kiley Moody, met with Greg McMahon, a loan officer at Commercial Bank. Moody was in the timber business and he had sought the Bank's assistance in financing the purchase of several tracts of real estate. The Bank required an "equity cushion," and on May 22, 2001, Ballard and his wife Ruby pledged 1,000 shares of Union Planters Bank stock for a $34,770 loan for Moody Land and Timber Company, a corporation owned by Moody. This stock pledge was apparently an interim measure to provide security until steps could be taken to pledge the Chickasaw County property to provide a twenty-percent cushion for Moody's ongoing timber needs. [1]

¶3.     On June 29, 2001, Ballard executed a deed of trust to the Bank. This deed of trust, which will be referred to as the first deed of trust, provided that Ballard's 226-acre parcel of land located in Chickasaw County, Mississippi, would stand as security for "[d]ebt incurred under the terms of all promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications, or substitutions." The allotted space to identify specific notes or other indebtedness, however, was left blank. The deed of trust included a provision which stated that "[t]he Secured Debt includes a revolving

---

[1] In his deposition, Ballard contended that the twenty percent equity cushion was merely a side deal Commercial Bank had with Moody. However, a memo dated June 29, 2001, and signed the same day by McMahon, stated that the "land in Chickasaw County valued at $150,000" was to support a "Moody Land and Timber line of credit" of $750,000 based upon "timber deeds totaling $600,000." Notably, $150,000 equals twenty percent of $750,000, which is the "maximum obligation limit" specified in paragraph three of the first deed of trust.

2

line of credit provision." The first deed of trust further provided that it secured "[a]ll future advances from Lender to Grantor or other future obligations of Grantor to Lender . . . " and that the "total principal secured by this Security Agreement at any one time shall not exceed $750,000.00." This deed of trust was signed at the Bank's offices in DeKalb, Mississippi, and each page was initialed by Ballard.

¶4. The parties dispute the purpose of the first deed of trust. According to Ballard, the first deed of trust was to serve as security for a line of credit to be used at his discretion, and only with his approval. According to the Bank, however, the purpose of the deed of trust was to secure a $750,000 line of credit for Ballard's grandson, Kiley Moody, or Moody's business, Moody Land and Timber.

¶5. On November 28, 2003, Ballard executed a second deed of trust to the Bank. This deed of trust mirrored the first deed of trust, but identified a number of notes which the land secured. The notes represented loans which were made to Moody and/or Moody Land and Timber Company. The second deed of trust stated that it was "given and taken in renewal and extension of a deed of trust dated the 29 day of June, 2001 . . . and [was] in no way intended to void the said deed of trust or impair the security thereof." Additionally, the second deed of trust added that "[t]his property described in Exhibit A is being pledged by Edward S. Ballard is [sic] collateral on all notes to Moody Land and Timber that originated since 8-29-01 and any further advances." This instrument was signed and each page initialed by Ballard at a bank in Alabama.

¶6. The purpose of this second deed of trust is likewise disputed. According to Ballard, the Bank, in November 2003, while preparing for an upcoming FDIC examination,

3

discovered that its notes given to Moody were unsecured and had not been repaid. Ballard claims that the Bank listed these obligations on the second deed of trust and sent Moody to obtain Ballard's signature in order to protect itself. To the contrary, the Bank contends that outstanding notes that existed when the first deed of trust was signed were fully secured by other deeds of trust. In addition, the Bank asserts that it did not consider Moody to be in default when Ballard signed the second deed of trust.

¶7. The dispute between the parties began when Michael Dudley, President of Commercial Bank, called Ballard to advise him that he might lose the Chickasaw County property if Moody could not repay more than $600,000 in loans the Bank had extended to Moody. [2] After advising Dudley that he knew nothing about any outstanding debt or overdue loans of Moody, and that he had never agreed for his property to serve as collateral for such loans, Ballard contacted his son, Richard Ballard, an attorney. Richard called Dudley, who explained that the Bank had two deeds of trust which pledged the Chickasaw County property as collateral. After obtaining copies of the deeds of trust and reviewing the instruments, Richard again called Dudley, who advised that he could not discuss the deeds of trust or the notes, as they concerned private business between the bank and Moody.

¶8. On June 7, 2004, Ballard filed a complaint against Commercial Bank seeking cancellation of two deeds of trust, contending that they were void, invalid, and unenforceable because they were unconscionable, were not supported by any consideration, and were the product of fraud and Commercial Bank's conspiratorial efforts to intimidate, threaten, harass,

---

[2] Moody filed a Chapter 7 bankruptcy petition on or about October 15, 2004.

mislead, and defraud. The remaining counts of the complaint asserted misrepresentation and fraud, as well as negligent and intentional infliction of emotional distress.

¶9. On February 8, 2007, Ballard filed a Suggestion of Death and Motion for Substitution of Party Plaintiff, which stated that "Edward S. Ballard died on January 20, 2007 and that [his] son, Richard P. Ballard, has been appointed as executor of the estate." An agreed order filed on February 12, 2007, substituted the estate of Edward S. Ballard, by and through its executor Richard P. Ballard, as the plaintiff.

¶10. On July 5, 2007, the chancellor entered his final judgment, directing "that Mr. Ballard's Complaint . . . be dismissed with prejudice," and authorized Commercial Bank "to proceed with foreclosure on either or both of Mr. Ballard's deeds of trust to it." The chancellor found that no one had coerced Ballard to sign the deeds of trust and that no one had prevented him from reading the documents. The chancellor acknowledged that Ballard's initials appeared on all pages of each deed of trust, and that the debt secured was clearly described in the second deed of trust. The chancellor determined that at the time Ballard signed the second deed of trust, Commercial Bank did not consider Moody's corporate debt to be in default, noting that on November 25, 2003, the Bank loaned Moody $11,534, and that Moody's 2003 credit report showed his credit to be good. The chancellor held that Ballard knew that the purpose of both deeds-of-trust was to secure loans made by Commercial Bank to Moody's timber business and that Ballard had no reasonable expectation that he would be contacted for prior approval of advances. According to the chancellor, the bottom line was that everything Ballard needed to know about Moody's debt to the Bank was contained in the second deed of trust, and that Ballard's failure to know the

5

deed of trust terms was not Commercial Bank's fault–Ballard could have simply declined to sign the second deed of trust.

¶11. Ballard filed a notice of appeal on August 2, 2007, raising the following issues for review: (1) whether the trial court erred in overruling plaintiff's motion for summary judgment; (2) whether the trial court erred in failing to require that the Bank prove that it was entitled to reform the only deed of trust it had when the loans were being made; (3) whether the trial court misapplied the rules of construction and thereby erroneously shifted the burden to the plaintiff to correct the Bank's claimed error; (4) whether the November 28, 2003, deed of trust can stand on its own, and whether the trial court's findings with respect thereto are supported by the evidence; (5) whether equity requires that the deeds of trust be voided; (6) whether the trial court erred in dismissing the plaintiff's claim of fraud and misrepresentation; and (7) whether either the June 29, 2001, deed of trust or the November 28, 2003, deed of trust can be used to foreclose upon the plaintiff's farm for the debts of his grandson.

¶12. We find that the dispositive issue in this case is whether the November 28, 2003, deed of trust was a valid deed of trust under which Commercial Bank may prosecute foreclosure proceedings.[3]

## STANDARD OF REVIEW

---

[3] We do not address Ballard's issue (1), because neither Ballard nor the Bank addresses the issue in their briefs. We also do not address Ballard's issue (5), because the issue was not considered by the court below.

6

¶13. This Court has a limited standard of review in examining and considering the decisions of a chancellor. *McNeil v. Hester*, 753 So. 2d 1057 (Miss. 2000). The court will not disturb the findings of the chancellor unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. *Dew v. Langford*, 666 So. 2d 739, 742 (Miss. 1995) (citing *Tinnin v. First United Bank of Mississippi*, 570 So. 2d 1193, 1194 (Miss. 1990)). Thus, where there is substantial evidence to support the chancellor's findings, this Court is without the authority to disturb his conclusions, although this Court might have found otherwise as an original matter. *Id*. (citing *In re Estate of Harris*, 539 So. 2d 1040, 1043 (Miss. 1989)).

## DISCUSSION

¶14. Ballard raises four arguments as to why the second deed of trust is not a valid deed of trust.

1. *The second deed of trust was an attempt to reform the first deed of trust.*

¶15. It is Ballard's position that the second deed of trust was an attempt to reform the first deed of trust, which failed to list the notes. We find that this assigned error is without merit. The second deed of trust was not an effort at reformation. *See Barataria Canning Co. v. Ott*, 88 Miss. 771, 781, 41 So. 378, 380 (1906) (when a written instrument fails to express the intention of the parties, a court in equity will grant it relief, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing). Rather, the second deed of trust constituted a renewal and extension which imposed additional terms on the parties. Therefore, no further analysis concerning reformation is necessary.

7

2. *The second deed of trust does not unambiguously secure Moody's debts.*

¶16. Ballard seeks to void the first deed of trust, arguing that the deed of trust is unambiguous on its face and that the chancellor erred in relying upon extrinsic evidence. On the other hand, Ballard contends that extrinsic evidence should be considered with regard to the second deed of trust.

¶17. This Court has held repeatedly that the meaning of the language and the intention of the parties is to be found in the language used in the instrument. **Rogers v. Morgan**, 164 So. 2d 480, 484 (Miss. 1964); s*ee also* **Goff v. Avent**, 122 Miss. 86, 84 So. 134 (1920); **Gulf & S. I. R. Company v. Patten**, 180 Miss. 756, 178 So. 468 (1938); **Ford v. Jones**, 85 So. 2d 215 (Miss. 1956). One well-established rule of construction directs that "the intent of the parties be gathered from the plain and unambiguous language contained [in the instrument they signed]." *Id*.

¶18. The chancellor acknowledged that the first deed of trust "[did] not describe any debt to Commercial Bank and certainly not the debt of Moody Land and Timber." Although the chancellor made a finding as to the parties' intent, this was not dispositive to his ruling. The chancellor further explained that Ballard is bound by what he signed and that "the second deed of trust unambiguously secures specified Kiley's debts." Thus, while the chancellor alluded to the parties' intent, he based his ruling upon the plain language of the second deed of trust.

3. *The second deed of trust is void for lack of consideration.*

¶19. Ballard argues that the second deed of trust is void for lack of consideration and thus cannot stand on its own. *See* **Catlett v. Bacon**, 33 Miss. 269 (Miss. 1857) (Mississippi courts

8

have declared mortgages void, invalid, and unenforceable for want of consideration); *Jackson v. Holt*, 6 So. 2d 915 (Miss. 1942) (want of consideration has been referred to as a want of equity, and Mississippi courts have characterized such an agreement or deed of trust as *nudum pactum*). To the contrary, the Bank contends that sufficient consideration was given.

¶20.    It has long been the rule in Mississippi that an extension of time to pay an existing note is sufficient consideration for a subsequent deed of trust. *See, e.g., Jones Supply Co. v. Ishee*, 163 So. 2d 470, 473 (Miss. 1964). Furthermore, it cannot be argued that antecedent debt, even that of someone other than the grantor, fails to provide sufficient consideration. The Restatement (Third) of Property Mortgages states that "(c) [a] mortgage that secures a performance of a preexisting legal obligation is enforceable." Restatement (Third) of Property Mortgages § 1.2(c) (1997). This Court has quoted the Restatement with approval in determining mortgagors' obligations under deeds of trust. *See Shutze v. Credithrift of America, Inc.*, 607 So. 2d 55 (Miss. 1992).

¶21.    In addition to the Restatement, this Court also has looked to the Uniform Commercial Code for guidance. The Mississippi Uniform Commercial Code explicitly provides that "[a]n instrument is issued or transferred for value if . . . [it] is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due . . . ." Miss. Code Ann. § 75-3-303(a) (Rev. 2002).

¶22.    The chancellor concluded that the second deed of trust was supported by legally sufficient consideration and thus could stand on its own. We find that the chancellor's determination was correct and should be affirmed. The notes in the instant case represent

9

antecedent debt, as each note was issued to Moody by Commercial Bank prior to Ballard's execution of the second deed of trust.[4] As the second deed of trust can stand alone, it can be used to foreclose on Ballard's property, absent fraud or misrepresentation.

        4. *The second deed of trust was procured through fraud and misrepresentation.*

¶23.    Ballard alleges that the trial court erred in dismissing his claims of fraud and misrepresentation. Ballard submits that the trial court incorrectly relied on the rule that a person is charged with knowledge of a written instrument, regardless of whether they read it. In response, the Bank states that Ballard is bound as a matter of law by what he signed, that an essential element of any claim of fraud or misrepresentation is reasonable reliance, and that the Bank had no duty to advise Ballard with regard to the deeds of trust, as it had no fiduciary relationship with Ballard.

¶24.    Numerous Mississippi cases support the Bank's contention that Ballard is bound as a matter of law by what he signed. *See, e.g., **Oaks v. Sellers***, 953 So. 2d 1077, 1082 (Miss. 2007); ***Andrus v. Ellis***, 887 So. 2d 175, 180 (Miss. 2004) ("'[i]n Mississippi, a person is charged with knowing the contents of any document that he executes'"; "'[a] person cannot avoid a written contract which he has entered into on the ground that he did not read it or have it read to him'"); ***Bailey v. Estate of Kemp***, 955 So. 2d 777 (Miss. 2007); ***Carter v. Citigroup, Inc.***, 938 So. 2d 809 (Miss. 2006); ***Alliance Trust Co., Ltd. v. Armstrong***, 185 Miss. 148, 163, 186 So. 633, 635 (1939) ("To permit a party when sued on a written contract to admit that he signed it but to deny that it expresses the agreement he made or to allow him

---

    [4] One note was issued to Moody on November 25, 2003, prior to Ballard's signing the second deed of trust on November 28, 2003.

to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts.").

¶25.    The Bank next notes that even consumer debtors alleging fraud have failed as a matter of law to escape their obligations despite claims of fraudulent inducement, as an essential element of any claim of fraud or misrepresentation is reasonable reliance.  *Franklin v. Lovitt Equipment Co., Inc.*, 420 So. 2d 1370, 1373 (Miss. 1982).  As a matter of law, one may not reasonably rely on oral representations, whether negligently or fraudulently made by the lender, which contradict the plain language of the documents.  *See Rankin v. Brokman*, 502 So. 2d 644, 646 (Miss. 1987) (A plaintiff's reliance on an allegedly fraudulent representation, concealment, or non-disclosure is not reasonable as a matter of law if the representation is contradicted by the written terms of a written contract he signed.).  "[A] person is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract."  *Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber Co., Inc*., 584 So. 2d 1254, 1257 (Miss. 1981).

¶26.    Ballard's burden with respect to his claims of fraud and misrepresentation is a heavy one–one seeking to invalidate a deed of trust must produce clear and convincing evidence. *See, e.g., Haygood v. First Nat'l Bank of New Albany*, 517 So. 2d 553 (Miss. 1987); *Haynes v. AVCO Sec. Corp.*, 299 So. 2d 198 (Miss. 1974).  *See also, Thomas v. B. Rosenberg & Sons*, 153 Miss. 314, 120 So. 732 (1929) (deeds of trust are presumed valid; cancellation of deeds of trust for fraud involves extraordinary power not to be exercised except in clear cases).

11

¶27. We find that the chancellor correctly held that the aforementioned authorities render irrelevant Ballard's rhetorical question: ". . . [W]ho reads all the fine print and all junk? Nobody. I never did." Like anyone else, Ballard is charged by law with knowing the contents of any documents that he signs. This is particularly true given that Ballard, by his own admission, had an opportunity to read the first deed of trust before signing, and that he signed the second deed of trust without reading it and in the presence of his grandson and a notary. Just as no one prevented Ballard from reading the documents which he signed, no one coerced him to sign the documents.

¶28. The facts support holding Ballard responsible for reading the instruments that he clearly signed. At the time he signed the first deed of trust, Ballard was sixty-eight years old. At the time he signed the second deed of trust, he was seventy-one. While Ballard did suffer from heart problems, he had no mental impairment. According to Ballard's deposition testimony, he still used a fax machine to transact business "every day" and had a computer for internet access and online trading.[5] While Ballard's widow and son, at trial, both denied that Ballard used either the fax machine or the internet, they did concede that Ballard acted competently when he signed a bill of sale for a $20,000 Lexus automobile on November 26, 2003; when he signed a deed conveying a remainder interest in the Chickasaw County land to Richard's son, Dane, in 2004; when he filed this lawsuit in 2004; when he served responses to the Bank's interrogatories on June 27, 2005; and when he gave his deposition

---

[5] Ballard died on January 20, 2007, between the time he gave his deposition in this case and the time of trial.

12

on June 7, 2006. In addition, Ballard was never under a conservatorship, nor were steps ever taken to place him under a conservatorship.

¶29. Furthermore, Ballard was both educated and experienced, and was no stranger to commercial loan transactions. By his own account, Ballard had "borrowed millions, and millions, and millions" from other commercial lenders over the years, and also had considerable experience with lines of credit and deeds of trust.

¶30. Finally, according to Ballard, a claim for fraud can be based on a party's failure to disclose a fact, if he was under a duty to disclose that fact. *See Holman v. Howard Wilson Chrysler Jeep, Inc.*, 972 So. 2d 564 (Miss. 2008).

¶31. As noted earlier, it is the Bank's position that it had no fiduciary relationship with Ballard and thus had no duty to advise him or make disclosures with regard to the deeds of trust. Numerous Mississippi cases support the Bank's position. *See, e.g., MS Credit Ctr. v. Horton*, 926 So. 2d 167 (Miss. 2006) ("Duties to disclose or to act affirmatively, such as explaining the terms of a contract, do not arise in arm's length transactions or under an ordinary standard of care. Rather, they arise only in fiduciary or confidential relationships."); *Turner v. Torry*, 799 So. 2d 25, 36 (Miss. 2001) ("parties to an arms-length transaction are charged with a duty to read what they sign; failure to do so constitutes negligence.").

¶32. In his final judgment, the chancellor agreed with the Bank in holding that "[t]he Bank had no duty to explain things to Mr. Ballard or to protect him from his own grandson, who was not the Bank's agent. There is in any event no evidence that Mr. Ballard ever requested an explanation from the Bank." *See, e.g., EquiFirst Corp.v. Jackson*, 920 So. 2d 458, 463 (Miss. 2006) ("nothing indicates that anyone prevented [the borrowers] from reading the

13

documents or asking any questions," rejecting contention that lender's closing attorney "had an obligation to explain the contracts to them.").

¶33.   We find, therefore, that the chancellor's dismissal of Ballard's claims of fraud and misrepresentation was proper and supported by the evidence.

### CONCLUSION

¶34.   The chancellor's findings with regard to the second deed of trust are affirmed.  The second deed of trust is capable of standing on its own, as it is supported by sufficient consideration and is not the result of any fraud or misrepresentation.   Therefore, this Court finds that the second deed of trust may be used to foreclose on the Ballard property.

¶35.   **AFFIRMED.**

**SMITH, C.J., DIAZ, P.J., CARLSON, GRAVES, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.  EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**